IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JAMES W. BOLT                                                                                        PLAINTIFF

v.                                        Civil No. 14-5223

JANE DOE #1, Agent of the Federal
Bureau of Investigation (FBI), North Miami
Beach, Florida; a/k/a Patricia Lincoln, Katherine
Lewis, and Leah Cleveland; SHERIFF KELLEY
CRADDUCK, Benton County, Arkansas; NURSE
DARLA WATSON, Benton County Detention Center;
ROBERT CESSERIO, FBI, Special Agent,
Fayetteville, Arkansas; and SHERIFF TIM HELDER,
Washington County, Arkansas                                                                DEFENDANTS

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by the Plaintiff pursuant to 42 U.S.C. § 1983. Plaintiff proceeds *pro se* and *in forma pauperis* (IFP). Pursuant to 28 U.S.C. § 1915(e)(2), the Court has the obligation to screen any complaint in which an individual has sought leave to proceed IFP. 28 U.S.C. § 1915(e)(2).

### 1, Background

According to the allegations of the complaint, this case began in late 2004 when Plaintiff was associated with a startup pharmaceutical company, Shimoda-Atlantic Oncology (Shimoda). Shimoda was contacted by a person going by the name of John Firo who indicated he was a specialist in raising private capital for startup companies. The alleged investor was Sheik Galani. In 2006, Shimoda's records were subpoenaed and Plaintiff was told that the Sheik was fake and everyone concerned would be going to prison.

Plaintiff and other associates were criminally charged. All were acquitted.

During discovery and during the criminal trial, Plaintiff indicates they learned the Federal Bureau of Investigation (FBI) had a covert program where they created both people and corporations with all manner of verifiable credentials, records, licenses, personal and professional histories. The operations were loosely governed by the United States Attorney General's Guidelines for Undercover Operations.

Shimoda continued in operation. In 2008, Plaintiff states they were approached by a person identifying herself as Leah Cleveland. She indicated she could help them with a clinical study of a new drug candidate Xenavex. She created documents, helped locate investors, and suggested changes to the clinical study. Most of her work was done offsite.

Shimoda was also interested in studying cationic magnetic hypothermia treatment on solid tumor disease. Cleveland suggested putting this study into a separate business entity, suggested a name for the entity, and indicated she might be able to find the money to fund it. Situs Oncology was then incorporated.

In 2009, Shimoda contemplated running their free clinic as a ministry or non-profit. Cleveland indicated she could assist with the non-profit foundation and knew a non-profit expert. The expert suggested taking over Life Preservers, Inc. (LPI). Over a period of several years, Cleveland provided donation records and efforts were made to collect the old LPI donations.

In late March of 2013, Cleveland terminated her relationship with Situs. In June of 2013, Robert Cesserio, an FBI agent, obtained a search warrant for Plaintiff's home and Situs. On August 29, 2013, Plaintiff was arrested and taken to the Benton County Detention Center (BCDC).

His claim against the FBI agent he knew as Cleveland is based on her conduct from 2005 through the present. He maintains she engaged in conduct calculated to entrap him or implicate him in a criminal event.

While in the BCDC, Plaintiff states he began experiencing chest pain and was taken to the hospital. He states he observed Cesserio talking to hospital staff. He maintains he did not authorize the hospital to speak to anyone about his medical condition. He claims his medical condition should not have been discussed with Cesserio.

From August 30th to mid-September, Plaintiff states he experienced ongoing problems with shortness of breath, poor exercise tolerance, nausea, vomiting, and periodic chest pain. From mid-September to December 23, 2013, Plaintiff states he experienced worsening problems including neurological issues such as loss of lower limb motor control, sleeplessness, periodic inability to speak, visual disturbances, inability to process the spoken language, seizures, and other issues.

Plaintiff maintains that all requests for medical care were denied by Nurse Darla Watson. Further, when it was finally arranged for him to be seen by a neurologist, as he was about to depart the jail for the exam, Nurse Watson instructed the deputies to not take the Plaintiff to the exam.

In connection with his pending criminal case, a hearing was held in which Nurse Watson stated that Plaintiff was faking it; she had video evidence of the Plaintiff walking normally; she had test results showing he did not have lyme disease; and she had evidence of malingering. Nurse Watson later said her statements were based on information two FBI agents had given her.

Plaintiff's asserts a claim against Nurse Watson based on her offering untruthful testimony in his criminal case, United States v. Bolt, Cr. 13-50085. He also maintains she intentionally denied him access to necessary medical care.

The WCDC jail physician then ordered a neurological and/or infectious disease specialist examination and consult. Prior to these appointments, Nurse Watson arranged for Plaintiff's transfer from the BCDC to the Washington County Detention Center (WCDC).

During transport, Plaintiff states he was exposed to extreme cold without adequate thermal protection and began to have chest pain and shortness of breath. Upon arrival at the WCDC, he notified the staff of his chest pain and need for nitroglycerine. He was told he would have to wait and see the nurse that evening. He was put in a holding cell which he states was cold. At some point, Plaintiff states he was found unconscious on the floor. He was taken by ambulance to the hospital. While he was being evaluated, the deputies told hospital staff that the United States Marshal Service wanted him transported back to the WCDC immediately.

Plaintiff continued to experience medical problems and in June of 2014 was diagnosed by the jail doctor, Dr. Mullins, as having chronic obstructive pulmonary disease. He was put on medication and a neurological examination was ordered. As of July 14, 2014, the examination had not occurred.

With respect to his conditions of confinement, Plaintiff contends both detention centers suffered from the following deficiencies: the use of lock out pods; prisoners being subjected to prolonged periods of extreme noise; restroom facilities that were unsafe, unsanitary, and too limited by number with a large number of prisoners required to use the same toilet during lock out periods; extremely low wintertime temperatures; condensation and pooling of water on the floors; the only available drinking water came from a sink/stool combination fixture; the food was unsuitable for long-term use; the medical care was inadequate, needed care was withheld, needed care was interfered with; overcrowding; not being allowed to know the date, day of the week, or time of day; no law library; limitations on personal grooming including shaving and hair cuts; no mental health screening; the common areas are unsuitable for long-term confinement; and inadequate facilities for visits from attorneys or others.

With respect to both Sheriff Cradduck and Sheriff Helder, Plaintiff asserts they maintained a jail setting designed and intended to cause physical and emotional injury and to deprive him of needed medical care. He maintains that the conditions of confinement constitute retributive or vindictive punishment. Plaintiff also maintains that Sheriff Cradduck's deputies denied him access to prescribed medication on December 23, 2013.

**2. Discussion**

Under the Prison Litigation Reform Act (PLRA), the Court is obligated to screen the case prior to service of process being issued. The Court must dismiss a complaint, or any portion of it, if it contains claims that: (a) are frivolous or malicious; (b) fail to state a claim upon which relief may be granted; or (c) seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b).

A claim is frivolous if "it lacks an arguable basis either in law or fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989). A claim fails to state a claim upon which relief may be granted if it does not allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). "In evaluating whether a pro se plaintiff has asserted sufficient facts to state a claim, we hold 'a *pro se* complaint, however in artfully pleaded, . . . to less stringent standards than formal pleadings drafted by lawyers.'" Jackson v. Nixon, 2014 WL 1258016, *2 (8th Cir. March 28, 2014)(quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007)).

Several of Plaintiff's claims are subject to dismissal. First, with respect to Cleveland, the claims against her are not presently cognizable. In Heck v. Humphrey, 512 U.S. 477 (1994), the Supreme Court held that a claim for damages for "allegedly unconstitutional conviction or

AO72A (Rev. 8/82)

imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid" is not cognizable until "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus." Id., at 486-87.

In United States v. Bolt, Cr. No. 13-50085, Plaintiff was charged with engaging in schemes to defraud by claiming unpaid donations or unclaimed property. Plaintiff was convicted of wire fraud, mail fraud, and money laundering on June 24, 2014. Plaintiff has appealed the conviction. The case is currently on appeal. The judgment has not been reversed or otherwise held to be invalid. Plaintiff therefore may not pursue a claim against Cleveland at this time.

Similarly, the Plaintiff may not pursue claims against Cesserio based on alleged false statements or testimony in connection with the criminal charges filed against the Plaintiff. Such claims by their nature seek to challenge the validity of the criminal conviction.

Second, his claims against Sheriff Cradduck and Sheriff Tim Helder are subject to dismissal. Liability under § 1983 requires some personal or direct involvement in the alleged unconstitutional action. See e.g., Ripon v. Ales, 21 F.3d 805, 808-09 (8th Cir. 1994). There is no allegation that either Sheriff was: involved in the day to day operations of the jail; aware of the Plaintiff's claims regarding the conditions of confinement; aware of Plaintiff's incarceration there; involved in the provision of medical care to detainees; personally present, or consulted, at any point about the Plaintiff during his incarceration there; or personally involved in responding to Plaintiff's grievances. See Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997)(no evidence that the defendants were doctors or were personally involved in making

medical decisions about treatment); Mark v. Nix, 983 F.2d 138, 139-40 (8th Cir. 1993)(section 1983 liability requires some personal involvement or responsibility). General responsibility for supervising the jail is insufficient to establish personal involvement. Reynolds v. Dormice, 636 F.3d 976, 981 (8th Cir. 2011).

With respect to the official capacity claims, they are "functionally equivalent to a suit against the employing governmental entity." Vetch v. Barbels Lutheran Home, 627 F.3d 1254, 1257 (8th Cir. 2010). In other words, the official capacity claims are treated as claims against Benton County or Washington County. See Murray v. Line, 595 F.3d 868, 873 (8th Cir. 2010).

"[It is well established that a municipality cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." Atkinson v. City of Mountain View, Mo., 709 F.3d 1201, 1214 (8th Cir. 2013). To establish either Benton or Washington County's liability under § 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." Moyle v. Anderson, 571 F.3d 814, 817 (8th Cir. 2009)(citation omitted). The applicable law has been summarized as follows:

> There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with "deliberate indifference" to its known or obvious consequences. *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir. 2008). There need not be a finding that a municipal employee is liable in his or her individual capacity before municipal liability can attach. *Speer v. City of Wynne*, 276 F.3d 980 (8th Cir. 2002); *Parrish v. Luckie*, 963 F.2d 201, 207 (8th Cir. 1992) ("A public entity or supervisory official may be held liable under § 1983 even though no government individuals were personally liable."). Where an official policy is itself unconstitutional or directs employees to take unconstitutional action, no evidence beyond a statement of the policy and its

exercise is necessary to establish § 1983 liability. *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 389-90 (8th Cir. 2007).

Id. at 817-18.  Here, Plaintiff has not alleged the existence of an unconstitutional policy or custom.

Finally, Plaintiff's claim against Cesserio based on an alleged violation of Plaintiff's right to privacy in medical information is subject to dismissal.  In Whalen v. Roe, 429 U.S. 589, 599 (1977), the Court discussed a constitutionally protected "zone of privacy" involving two different kinds of interests.  Id., 429 U.S. at 598-599.  The first "is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions."  Id. at 599.

Following Whalen, the courts have recognized a constitutionally protected right of individuals to avoid disclosure of personal matters including medical information.  This right has been variously characterized as the right to confidentiality or the right to privacy.  See e.g., Cooksey v. Boyer, 289 F.3d 513, 515-516 (8th Cir. 2002).  However, as pointed out by the Eighth Circuit in Cooksey "[n]ot every disclosure of personal information will implicate the constitutional right to privacy."  Id., 289 F.3d at 516.  The Eighth Circuit noted it had "consistently held that to violate the constitutional right of privacy the information disclosed must be either a shocking degradation or an egregious humiliation . . . to further some specific state interest, or a flagrant bre[a]ch of a pledge of confidentiality which was instrumental in obtaining the personal information."  Id. (citations and internal quotation marks omitted).  This right extends to medical test results, medical records, and medical communications.  See Ferguson v. City of Charleston, 532 U.S. 67, 78 (2001)(individuals have a reasonable

expectation of privacy in medical test results and that those results will not be shared with non-medical personnel without the patient's consent).

In the context of individuals detained in prisons or jail, it has been held that although "prisoners do not shed all constitutional rights at the prison gate, . . . lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Sandin v. Conner, 515 U.S. 472, 485 (1995).  A number of cases have addressed the issue of the right to privacy of medical information in the prison context.  In Doe v. Delie, 257 F.3d 309 (3d Cir. 2001), the Third Circuit held that "the Fourteenth Amendment protected an inmate's right to medical privacy, subject to legitimate penological interests." Id., 257 F.3d at 311.

The Third Circuit stated:

It is beyond question that information about one's HIV-positive status is information of the most personal kind and that an individual has an interest in protecting against the dissemination of such information. Moreover, a prisoner's right to privacy in this medical information is not fundamentally inconsistent with incarceration. Therefore, we join the Second Circuit in recognizing that the constitutional right to privacy in one's medical information exists in prison.

We acknowledge, however, that a prisoner does not enjoy a right of privacy in his medical information to the same extent as a free citizen. We do not suggest that Doe has a right to conceal this diagnosed medical condition from everyone in the corrections system. Doe's constitutional right is subject to substantial restrictions and limitations in order for correctional officials to achieve legitimate correctional goals and maintain institutional security.

Doe, 257 F.3d at 317.

In Seaton v. Mayberg, 610 F.3d 530, 535 (9th Cir. 2010), the court noted that "society would insist that the prisoner's expectation of privacy always yield to what must be considered

the paramount interest in institutional security. . . . We join our sister circuits in holding that prisoners do not have a constitutionally protected expectation of privacy in prison treatment records when the state has a legitimate penological interest in access to them."

The Court of Appeals for the Eighth Circuit in Tokar v. Armontrout, 97 F.3d 1078 (8th Cir. 1996), addressed Tokar's argument that his constitutional right to privacy had been violated by his segregation. Tokar argued the segregation disclosed his HIV-positive status to other inmates and officers. Id., 97 F.3d at 1084. The court noted the Seventh Circuit in Anderson v. Romero, 72 F.3d 518 (7th Cir. 1995), had held that "'[n]either in 1992 nor today was (is) the law clearly established that a prison cannot without violating the constitutional rights of its HIV-positive inmates reveal their condition to other inmates and to guards in order to enable those inmates and guards to protect themselves from infection.'" Tokar, 97 F.3d at 1084 (quoting Anderson, 72 F.3d at 521); see also Beers v. Stockton, 2000 W.L. 1839535, *1 (8th Cir. 2000)(Medical information released to nurse at another jail where Beers had been transferred after he made representations regarding what medications he was taking. Jury could not conclude that "the release was made in bad faith or for reasons unrelated to the continuity of Beer's medical care and to prison security. Likewise, Stockton's release of medical information to [facility] non-medical personnel was related to penological concerns").

In Tokar and the other cases cited above, the right recognized was one guarding against disclosure of the medical information, *i.e.* "the right to maintain the confidentiality of previously undisclosed medical information." Powell v. Schriver, 175 F.3d 107, 112 (2nd Cir. 1999). In such cases, the disclosures were held not to violate the right to privacy if they were for the purpose of managing the custody of an inmate or to protect the public.

In this case, there is no suggestion that Cesserio himself **disclosed** any medical information. If in fact the conversation that Plaintiff witnessed occurring between Cesserio and hospital staff was about Plaintiff's medical condition, the disclosure came from the hospital staff. Cesserio is not accused of having disseminated the information "amongst correctional officers, the inmate population, or others for an improper purpose." Franklin v. Wall, 2013 WL 1399611, *4 (W.D. Wis. 2013). Under the circumstances, Plaintiff has failed to state a claim upon which relief may be granted.

### 3. Conclusion

For the reasons stated, I recommend that all claims against Jane Doe 1(above referred to as Leah Cleveland), Sheriff Cradduck, Sheriff Helder and Agent Robert Cesserio be dismissed. Further, I recommend that all official capacity claims be dismissed. This leaves for later resolution the Plaintiff's individual capacity claims against Nurse Darla Watson. The complaint will be served on Nurse Watson.

**The Plaintiff has fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The Plaintiff is reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 10th day of October 2014.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-11-