IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JAMES W. BOLT                                                    PLAINTIFF

        v.                        Civil No.  14-5223

NURSE DARLA WATSON                                              DEFENDANT

## **REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

This is a civil rights action filed by the Plaintiff pursuant to 42 U.S.C. § 1983.  The

Plaintiff, James W. Bolt, proceeds *pro se* and *in forma pauperis*.  He names as the defendant

Nurse Darla Watson; and, his only remaining claims against Nurse Watson are against her in her

personal capacity.

Bolt is currently incarcerated in the Federal Medical Center in Lexington, Kentucky.

Bolt's claims in this action concern his confinement at the Benton County Detention Center

(BCDC).  Bolt alleges that his constitutional rights were violated by Nurse Watson while he was

incarcerated in the Benton County Detention Center (BCDC).  Specifically, Bolt asserts that

Nurse Watson denied his requests for medical care; and, that when it was finally arranged for

him to be seen by a neurologist, as he was about to depart the jail for the exam, Nurse Watson

instructed the deputies to not take the Plaintiff to the exam.  The Plaintiff also asserts a claim

against Nurse Watson based on her allegedly offering untruthful testimony in his criminal case.

-1-

A hearing was held on October 26, 2015, to allow Bolt to respond to the Defendant's Motion for Summary Judgment. (Doc. 35). During the hearing, Defendant's Supplemental Answers to Plaintiff's First Set of Interrogatories were made part of the record as Plaintiff's Exhibit 1; and, Defendant's Supplemental Response to Plaintiff's Request for Admission were made part of the record as Plaintiff's Exhibit 2. (Doc. 46).[1]

Following the hearing, and as a result of the testimony of the Plaintiff, the following supplemental evidence was requested and provided to the Court: an Affidavit of Sergeant Tiffany DeVore (Doc. 52). In addition, the Court issued subpoenas for the following medical records: medical records of the Plaintiff from Baptist Medical Center, Oklahoma City, Oklahoma; medical records of the Plaintiff from the Federal Medical Center Lexington, Kentucky; medical records of the Plaintiff from Oklahoma University Medical Center, Edmond, Oklahoma; medical records of the Plaintiff from Oklahoma University Medical Center, Oklahoma City, Oklahoma; and medical records of the Plaintiff from Washington County Detention Center. The Court received a response from Oklahoma University Medical Center Edmond on November 18, 2015 (Doc. 58); and, a response from Oklahoma University Medical Center on December 8, 2015 (Doc. 63). The Court received medical records from the Federal Medical Center Lexington, Kentucky on December 7, 2015 and, medical records from Washington Regional Detention Center on December 8, 2015. The medical records received are Court's Exhibits 1 and 2. (Doc. 65, 66).

---

[1] With respect to the supplemental responses to Plaintiff's discovery, the Plaintiff pointed out that some of the Defendant's responses to the requests for admissions changed in her supplemental responses, which included a verification from the Defendant. The Defendant's counsel reported that she was not sure why the Defendant changed her answers upon second review and verification of the document, but did assure the Court that the Defendant had personally seen and answered the requests for admissions prior to submitting Defendant's original responses to the requests for admission to the Plaintiff. The Plaintiff argued that Rule 36(b) of the Federal Rules of Civil Procedure prevents a change of a party's response to requests for admissions without permission from the court. However, as Defendant's counsel pointed out, Rule 36(b) only prevents the *withdrawal of an admission* without court approval; here, the changes made by the Defendant were from a denial to an admission instead of a withdrawal of an admission.

AO72A
(Rev. 8/82)

Despite the subpoena and repeated calls to Baptist Medical Center, Oklahoma City, Oklahoma, the Court did not receive a response from the facility.

Further, the Court reviewed a recording of the telephonic hearing taken in <u>United States of America v. James W. Bolt</u>, United States District Court, Western District of Arkansas, Fayetteville Division, Case No. 13-50085, on November 20, 2013, concerning United States Marshal's Service procedure with respect to the scheduling of a federal detainee's outside medical appointments and transportation to any outside medical appointments.  (Doc. 53).

Finally, the Court notes that, after the hearing, on November 23, 2015, Bolt filed a pleading entitled Plaintiff's Objections Regarding the October 26, 2015 Teleconference/Hearing (Doc. 61).  In the Objections, in addition to other arguments, Bolt objected to the Court "disallowing the Plaintiff the opportunity to respond in writing to the Motion for Summary Judgment filed by Defendant."  In response to the Objections, the Court entered an Order on December 7, 2015 stating "[a]lthough the Court did not previously 'disallow' a written response from the Plaintiff with respect to the Defendant's motion for summary judgment, the Plaintiff will now be permitted to file a written response to the motion by December 21, 2015."  (Doc. 62).  Bolt did not file an written response following the Court's December 7, 2015 Order permitting him to do so.

### Background

**The following facts are taken from the Jail File of the Plaintiff:**

A warrant for the arrest of James Bolt was issued by the United States District Court for the Western District of Arkansas on August 29, 2013.  (Doc. 38, Ex. A1, p. 29-49).  Bolt was taken into the custody of the BCDC on that day.  (Doc. 38, Ex. A1, p. 51).

-3-

Soon after being taken into custody, Bolt complained of chest pains and stated that he had a pacemaker. Bolt was observed at the nurses station and Dr. Lafferty instructed that he be administered ASA and Nitroglycerin SL. Bolt was transported by EMS to the Emergency Department of Mercy Hospital Northwest Arkansas on report of chest pains. (Doc. 38, Ex. A1, p. 59-87, 124).

Bolt again complained of chest pains on August 30, 2013 and was seen in the nurse's station at the BCDC. (Doc. 38, Ex. A1, p. 124). Dr. Lafferty was consulted and ordered administration of ASA and Nitroglycerin. Bolt was again transported by EMS to the ER of Mercy. At Mercy, Bolt was given prescriptions for acetaminophen (every 4 hours as needed for pain); aspirin (81 mg daily); diltiazen CD/Cardizem CD (once daily); Hydrocodone-acetominophen (every 6 hours as needed for pain); lisinopril (10 mg daily); and nitroglycerin (1 tablet under tongue every 5 minutes as needed for chest pain). He was discharged on the same day. (Doc. 38, Ex. A1, p. 92-103, 129). Following Bolt's return to the BCDC on August 30, 2013, it was noted that he had a Cardizem prescription and that if the medication was ordered from the pharmacy, it would not be received until Wednesday, September 3, due to the Labor Day holiday. Dr. Lafferty was consulted and instructed the prescription to be ordered from a Wal-Mart pharmacy. (Doc. 38, Ex. A1, p. 129).

On September 1, 2013, Bolt was brought to the nurses station and saw Nurse Watson. He complained of chest pains and said that he could not breathe. His vital signs were taken. Dr. Lafferty was consulted and Bolt was administered medications in accordance with Dr. Lafferty's order. (Doc. 38, Ex. A1, p. 124, 129).

-4-

On September 2, 2013, Bolt was brought to the nurses station with complaints of "chest tightening" and dehydration.  His vital signs were taken and Dr. Lafferty was consulted.  Dr. Lafferty ordered promethazine 25 mg. four times per day for nausea.  (Doc. 38, Ex. A1, p. 125, 129).

Bolt was released from the BCDC on September 3, 2013 at 9:07 a.m. to the U.S. Marshal and FBI Agent Robert Cessario.  (Doc. 38, Ex. A1, p. 112).  Bolt was again arrested by the U.S. Marshal's Service at the Fayetteville Federal Building and was transported to the BCDC on September 3, 2013 at approximately 17:20.  (Doc. 38, Ex. A1, p. 104).

Upon intake on September 3, 2013, Bolt reported that he was taking the medications "Hydro, Lisinopril, Nitro."  He reported that he was recently hospitalized at Mercy Hospital on August 30, 2013 for chest pains and reported that he had a "bad shoulder and heart problems." (Doc. 38, Ex A1, p. 109).  The Marshal's Service also reported that Bolt had a pacemaker from 1994, a heart condition, and a prescription for Nitroglycerin.  (Doc. 38, Ex. A1, p. 111).

On September 3, 2013, Bolt was seen in the nurses station with complaints that he could not breathe.  Bolt stated that his kidneys were shutting down and that he had only kept down one and one half cups of water since September 1, 2013.  His vital signs were taken.  Nurse Watson noted that she found no notes showing that Bolt had not been eating his meals.  Nurse Watson examined Bolt and found evidence that his bladder contained urine.  Bolt asked for specific medication which was unavailable at the jail and stated that the medications ordered (Vistaril and Phenergan) "don't help much."  Dr. Lafferty was consulted and ordered "BMP in AM, Orthostatic vs" and to offer phenergan and fluids.  (Doc. 38, Ex. A1, p. 125, 129).

-5-

Bolt was again seen at the nurses station later in the day of September 3, 2013.  His vitals were checked.  Notations were made that Bolt took a shower and voided urine. Dr. Lafferty ordered orthostatic vital signs to be taken and labs drawn.  Nurses were told not to let Bolt know in advance that vital signs were to be repeated.  (Doc. 38, Ex. A1, p. 125, 129).

On September 27, 2013, Bolt reported trouble sleeping and on-going pain from "torn rotator cuff; ongoing cardiology problems."  Nurse Watson responded on September 30, 2013 that she would put him on the next nurses call list.  (Doc. 38, Ex. A1, p. 169-170).

On October 1, 2013, Bolt was seen by Nurse Watson at nurses call for his complaints noted on September 27.  Nurse Watson noted that she would request his records.  Dr. Lafferty ordered to discontinue Promethazine; and, give Benadryl and Tylenol.  (Doc. 38, Ex. A1, p. 129).

On October 1, 2013 at 7:23 p.m., Bolt asked "please renew my promethazine for nausea." On October 3, 2013 at 12:09 p.m., Bolt again requested "please renew my prescription for nausea.  I'm back to having great difficulty keeping food and fluids down."  On October 3, 2013, at 2:00 p.m., Nurse Watson responded "Promethazine is meant to be a short term medication. We also are aware of your issues with walking which is a side effect.  Will put you on the next nurse call list."  Later, at 4:09 p.m., Nurse Watson wrote "we will not be reordering at this time due to you being unsteady on your feet."  (Doc. 38, Ex. A1, p. 171-172).

On October 3, 2013, labs were drawn by Nurse Watson.  Dr. Lafferty ordered a test for Lyme Disease.  (Doc. 38, Ex. A1, p. 126, 130).

On October 3, 2013 at 6:00 p.m., Bolt wrote "thanks for the earlier response re promethazine – before coming here I was taking 8 mg ondansetr9n (sic) bid and did great." Nurse Watson responded on October 6, 2013, "we want to get you steady in your walk first and

-6-

then will discuss this.  What is the diagnosis that causes the nausea?" (Doc. 38, Ex. A1, p. 174).

On October 7, 2013, Bolt stated "dx last dec re nausea was vestibular disease.  It was initially

infrequent but by mid may was nearly constant but well managed with ondansetron.  Balance and

gait only recen5 (sic)."  Later that day he wrote, "only recently worsened, and now mirror the

neuro signs I had in 1994 when pacemaker was first put in and lyme was diagnosed."  Bolt also

wrote, "in 1994 2 lumbar punctures had elevated opening pressures with wbcs, and rbcs found.

Dx changed to include lepto meningeal infection from lyme.  Tx then was intrathecal on 2

separate occasions.  Dr. Mckee thinks I likely have recurant [sic] lyme disease."  On October 9,

2013, Nurse Watson responded "you will be pleased to know there is no evidence of Lyme

disease according to your blood work.  No order changes at this time." (Doc. 38, Ex. A1, p. 175-

177).

On October 9, 2013, Bolt wrote, "the study ordered would not be sufficient to dx cns

involvement.  That study requires an cfs specimen with per analysis.  Nor will that particular

study necessarily suffice for focal myocardial lesions or pericardial involvement.  But thanks for

trying."  Later on October 9, 2013, Nurse Watson asked, "is there a question?" (Doc. 38, Ex. A1,

p. 178).  Then, again on October 9, Bolt asked "Does Dr. Lafferty plan on a workup or not?"

Nurse Watson responded on October 10, 2013, "he reviewed your labs and chart today and is not

ordering any further treatment at this time." (Doc. 38, Ex. A1, p. 179).

On October 10, 2013 at 6:29 p.m., Bolt stated "tylenol is not helping with my shoulder

pain.  Could we increase the dosage or move on to something else.  Pain level remains at VAS

5-7 and it is still not possible for me to get a good nights rest.  Thank you."  Nurse Watson

replied on the same day at 2:20 p.m., "will put you on the next nurse call list. Ok." (Doc. 38, Ex.

-7-

A1, p. 180).  On October 10, 2013, Dr. Lafferty reviewed the lab results and found them negative for Lyme Disease.  Dr. Lafferty did not change any of the existing orders.  (Doc. 38, Ex. A1, p 126).

On October 14, 2013, Bolt was seen by Nurse Watson for shoulder pain.  Bolt reported that the shoulder pain was a result of a "rotator cuff" injury that occurred about 2 weeks prior to his arrest.  Bolt stated that Dr. Simpson in Fayetteville intended to treat with physical therapy and a TENS unit.  Bolt stated that he had a TENS unit at home but that he had never reported this because he "didn't know he could."  His vital signs were checked and recorded.  Bolt requested a vegetarian tray.  He also reported that he was diagnosed with Lyme Disease by Dr. Brown in Norman, Oklahoma in 1994.  He stated that he took Doxycycline for 4 weeks and then again for another 10 days.  He also reported a neuro-check with Dr. Al-Khatiz; and, that he had a series of rabies shots 18 months prior.  Bolt also reported that Dr. Marciniak put in a pacemaker in May, but that the "motion sensor" was off due to not having issues at the time.  (Doc. 38, Ex. A1, p. 126).  Dr. Lafferty ordered a vegetarian tray at Bolt's request.  (Doc. 38, Ex. A1, p. 130).

Also on October 14, 2013, Nurse Watson spoke with medical records staff about requesting records from Dr. Marciniak.  The clinic reported that Bolt had never seen Dr. Marciniak there; that Bolt's pacemaker was inserted by Dr. Weathers in May 2012; and, that they had no records prior to 2004.  (Doc. 38, Ex. A1, p. 127).

On October 15, 2013 at 9:20 a.m., Bolt asked, "may I please review the lab results for mondays study when they result.  Thank you."  A response was entered on October 17, 2013 by M. Smith: "you will see dr on his next visit.  You can discuss this at this time."  (Doc. 38, Ex. A1, p. 181).

-8-

On October 16, 2013, it was noted that Nurse Watson ordered that Bolt be allowed to use his TENS unit twice per day and that the TENS unit was taken to Dpod.  Bolt was to be allowed to come out to pod control two times per day to use the unit.  (Doc. 38, Ex. A1, p. 127).

On October 17, 2013, Bolt reported to M. Smith that he had the "best night of sleep I've had."  (Doc. 38, Ex. A1, p. 127).  On October 18, Bolt again reported to Nurse M. Smith, "I'm feeling pretty good this morning."  (Doc. 38, Ex. A1, p. 127).  Nurse M. Smith took and reported Bolt's orthostatic vital signs.  (Doc. 38, Ex. A1, p. 132).

Later on October 18, 2013, Bolt wrote, "Id [sic] visited earlier w/nurse watson abt new pain/sleep meds and anticipated change.  Could we please try tramadol for pain and trazadone for sleep?  Thanks."  Nurse Watson responded on October 22, 2013, "Spoke with Dr. Lafferty and he didn't want to change meds at that time as you seemed to be doing well.  Do you wish to have him contacted again?"  (Doc. 38, Ex. A1, p. 182).  Bolt responded, "please revisit the med issue w/dr lafferty – current meds are totally inadequate."  On October 24, 2013, Nurse Watson responded "what meds are you referring to?"  Nurse Watson also noted "see POS for med orders."  Dr. Lafferty ordered Trazodone 50 mg; Tramadol.  (Doc. 38, Ex. A1, p. 127, 131, 183).

On October 18, 2013, it was noted that a supervisor at Mercy stated that she would fax Bolt's EKG to BCDC.  The EKG was sent to Dr. Lafferty by email at his request.  (Doc. 38, Ex. A1, p. 127, 131).

On October 25, 2013, at 5:54 a.m., Bolt wrote, "issue has been resolved – thanks."  Nurse Watson responded, "great."  (Doc. 38, Ex. A1, p. 185).

On October 28, 2013, Bolt was seen at med pass and complained of fever but did not want to come to nurse call after med pass.  He was given Tylenol at his request.  He was to let

-9-

staff know if his complaints worsened or did not improve.  (Doc. 38, Ex. A1, p. 127).  Bolt was seen later on October 28 in Dpod.  His temperature was 99.7.  Bolt reported to feeling better after the Tylenol.  He reported that he would keep a watch on his condition and have the day shift follow up with him the next morning.  (Doc. 38, Ex. A1, p. 128).

On October 29, 2013, Bolt wrote, "may I please renew my rx for trazadone – tramadol is really helping with my rotator cuff problem.  After dosing, pain is a 3-4.  Could we increase the dose from 150 qid/3 to 300 qid/3 in hope of lowering pain level?  Thank you."  Later that day, Nurse Watson responded, "not sure what you are asking about Trazodone?  Will put you on the next nurse call list."  (Doc. 38, Ex. A1, p. 186).

On October 30, 2013, Bolt wrote, "please disregard pre msg re trazadone – I thought it expired on 1 nov. thanks."  Nurse Watson responded the following day, "ok."  (Doc. 38, Ex. A1, p. 187).

On October 31, 2013, Bolt wrote, "did my request for a trial of tramadol at 300 mg qd receive approval?  If it did, it has not filtered down to the med cart.  Thanks."  Nurse Watson responded later that day and stated, "will need to check your orders."  (Doc. 38, Ex. A1, p. 188).

On November 1, 2013, Bolt was seen at med pass.  He requested Tylenol for fever.  He was told there was no thermometer on the med cart but that the nurse would return after med pass was completed.  Bolt responded that he just wanted Tylenol then and stated "I'll be fine just with tylenol."  (Doc. 38, Ex. A1, p. 128).

On November 4, 2013, Bolt wrote, "any resolution yet on my request for a dosage escalation?"  On November 5, 2013, Nurse Watson responded, "not at this time . . . esp due to your unsteady gait."  (Doc. 38, Ex. A1, p. 189).

-10-

On November 5, 2013 at 6:03 p.m., Bolt wrote, "could I try naproxen w/ existing tramadol?"  Nurse Watson responded on November 6, 2013 at 8:39 a.m., "will put you on the next nurse call list."  (Doc. 38, Ex. A1, p. 190).

Bolt was seen by Nurse Watson later in the morning of November 6, 2013, with complaints of shoulder pain and headaches.  Dr. Lafferty was consulted regarding the medications. (Doc. 38, Ex. A1, p. 128).

On November 11, 2013, Bolt communicated through the kiosk system concerning the removal of a $20 charge.  Nurse Watson responded to the request on November 13.  (Doc. 38, Ex. A1, p. 191-192).

On November 24, 2013, Bolt complained that his Tramadol was not controlling his pain. He requested to try Aleve with his medication.  Dr. Lafferty ordered Aleve 220 mg twice a day for two weeks.  (Doc. 38, p. A1, p. 128, 131).

On December 5, 2013 Bolt wrote, "My attorney requested that I communicate with you regardless of my medical status.  First I would ask that you look carefully at the disclaimer, which appears at the end of the report for the lyme disease test.  (A negative result does not prove the absence of the disease).  Next I am having developing difficulty with speech, reading and writing.  Having both short and long term memory issues these problems at first were both brief and infrequent."  He later further wrote, "they are now more present than absent.  My ability to sleep at night was improved with trazedone.  It is no longer enough to get me through but about 4 hours of sleep.  May we try a dosage increase?  Do to a conflict of interest between myself and nurse watson, I would prefer my care issues to be handled by someone else.  At least until my next federal hearing or this matter has been concluded."  On December 9, 2013, Nurse Watson

-11-

AO72A
(Rev. 8/82)

responded, "Mr. Bolt, this is Nurse Watson and there is no conflict of interest for me. Will speak with Dr. Lafferty related to increasing your Trazadone. Will also confer with Dr. Lafferty related to your first message re: Lyme disease to see if would like to see you at his next visit." (Doc. 28, Ex. A1, p. 194).

On December 6, 2013, Bolt asked to continue Aleve. (Doc. 38, Ex. A1, p. 128). An order to continue Aleve was extended for two weeks. (Doc. 38, Ex. A1, p. 131). On December 9, 2013, according to Nurse Watson's notes, Bolt's tramadol and trazadone were increased to treat his pain and his sleep per an order from Dr. Lafferty. (Doc. 38, Ex. A1, p. 128, 131).

Bolt again complained about charges to his account for prescriptions on December 10, 2013. (Doc. 38, Ex. A1, p. 195-196).

On December 12, 2013 at 9:00 a.m., Bolt was seen at doctor call. Bolt complained of nausea, dizziness, balance issues, and short-term memory issues. He reported no vomiting since November; no diarrhea; and, no joint swelling. Dr. Lafferty noted that Bolt had a "shuffling gait" that he was "very off balance yet no near falls." He noted that the claims "seem exaggerated." Due to his gait issues, Dr. Lafferty discontinued tramadol but stated that Bolt could have Naproxen twice per day. (Doc. 38, Ex. A1, p. 128, 131, 132).

On December 12, 2013 at 12:43, Bolt wrote, "I just learned that Dr. Lafferty dc'd tramadol. The combo of tramadol with naproxen was doing an admirable job of pain mgmt and seemed to make a noticeable improvement in my balance. Please restart tramadol." On December 16, Nurse Watson responded, "Dr. Lafferty discontinued the Tramadol due to your gate [sic] issues." Bolt responded, "I understand Dr. Lafferty's concern re: my gait problem. I have not noticed any appreciable change in my gait before, during or after tramadol. My

-12-

shoulder pain and my chronic headache are appreciably worse w/o coverage for pain.  Would you please ask him if his current plan might be expanded to address pain management.  Also, still waiting on a refund of my commissary account."  Watson responded, "he is aware that you have a TENS unit for your shoulder pain.  Are you using it?"  (Doc. 38, Ex. A1, p. 198-199).

On December 14 and 17, 2013, Bolt complained about "unauthorized charges" to his account from the nursing station.  (Doc. 38, Ex. A1, p. 200-201).

On December 16, 2013, Bolt reported, "I went on a tx hold back when I was scheduled to see dr. al-khatib.  Will resume tens next week after the hearing on my release.  The tens was always intended to be an adjuvant therapy, not a monotherapy.  Please review my refund request."  On December 19, 2013, Nurse Watson responded, "I have sent a medical request to the federal marshall's office for authorization for your appt.  When we receive it, we will be able to set up your appt."  (Doc. 38, Ex. A1, p. 202).

On December 20, 2013, Bolt complained, "I have missed my morning dose of diltazem on 12/19 and 12/20 due to inavailability of the drug."  Nurse Watson responded, "I understand there was a mess-up from our pharmacy but this has been corrected."  (Doc. 38, Ex. A1, p. 203).  Bolt then stated, "Im somewhat confused by prev msg regarding my being seen by a specialist – does this mean that an exam by dr al-khatib is back on?  If so, please let me know so I can let my atty know – it will have a bearing on the next hearing in fed court.  Thank you."  On December 23, 2013, Nurse Watson responded, "I have sent an authorization into the federal marshall office to get permission to set-up an appt with a neurologist of Dr. Lafferty's choosing.  They have not responded yet."  (Doc. 38, Ex. A1, p. 205).

-13-

On December 22, 2013, Bolt complained that "for the 2nd time in about 10 days, dep. northup has refused to allow me access to my cell for bedrest . . . ." (Doc. 38, Ex. A1, p. 204). J. Martinez responded later on December 22, "[h]as medical giving (sic) you bed rest?  If so . . . . they must write in your file if not you do not have any."  (Doc. 38, Ex. A1, p. 204).  On December 23, 2013, Bolt requested "'bedrest' status do to limited mobility, chronic fatigue and related performance status issues."  Nurse Watson responded, "will discuss with Dr. Lafferty as he did not mention when he saw you last." (Doc. 38, Ex. A1, p. 206).

Bolt was released from the BCDC and transported to the Washington County Detention Center (WCDC) on December 23, 2013.  (Doc. 38, Ex. A1, p. 122).

**Summary Judgment Hearing Testimony:**

Bolt testified that he is 62 years old and was on pretrial status during his entire stay at the BCDC.  He stated that he has been diagnosed with myelopathy, which he testified causes memory issues.  He stated that Nurse Watson's indifference to his medical needs began on day one of his stay at the BCDC.  He stated that she ignored him and believed that he was faking his medical issues.  He stated that Nurse Watson told him to "suck it up" and to go on into the pod and not give her any more trouble.  He stated that he believed Nurse Watson was responsible for delays and interruptions of medication; and, that Nurse Watson voiced her disbelief of his complaints to subordinate staff.  He stated that he has an atrial fibrillation; and, that it is possible that but for the delay in care that he alleges was caused by Nurse Watson, he could have a better outcome.  However, Bolt admitted that a better outcome was not certain.

Bolt was asked if his current facility, the Federal Medical Center in Lexington (FMC), had done anything that the BCDC did not do.  Bolt testified that the FMC had not been

-14-

successfully able to diagnose and treat his heart condition until approximately 45 days prior to the summary judgment hearing. The FMC tried various combinations of medication and eventually performed a cardiac ablation.

Bolt testified that he requested nitroglycerin at least six times and did not receive it. Bolt testified that denial of nitroglycerin caused him to suffer pain. However, none of those requests were in writing. The requests were made to deputies and, when asked if he has any evidence that the deputies communicated his need for nitroglycerin to Nurse Watson, Bolt answered "no."

When asked why he did not follow up in writing, he testified that he did make a grievance in writing on paper in October. However, the grievance was made on paper because the kiosk system at the jail was "often down." Although Bolt states that he wrote the complaint on a piece of paper, labeled it "Grievance," and gave it to Deputy Deveraux, the "grievance" is not contained in his jail file. Bolt did not complete a written grievance concerning his requests for cardio testing or any other complaints.

The Supplemental Affidavit of Tiffany DeVore (Doc. 52) addresses the grievance procedure of the BCDC. According to the Affidavit, in 2013, the grievance process was handled through the electronic kiosk system. DeVore does not recall the kiosk system being down for any significant period of time in 2013, but if the system was down, an inmate would complete a grievance on a piece of paper and give it to a deputy. The deputy would then give it to the appropriate person; the grievance would be answered; a copy would go into the inmate's booking file; and, the original would be returned to the inmate. (Doc. 52).

Bolt also testified that his neurological condition worsened due to his lack of medical care. He testified that Nurse Watson "simply ignored me." Although Dr. Lafferty ordered a test

-15-

for Lyme Disease, Bolt states that the test Nurse Watson requested did not provide clear results

concerning Lyme Disease.  When asked if he has been diagnosed with Lyme Disease since

leaving the BCDC, Bolt testified "no" that he is still in the workup phase.  Bolt testified that

since leaving the BCDC, his preliminary diagnosis indicates memory loss, myelopathy, and gait

disturbance.  He testified this diagnosis was made on approximately June 8, 2015.

      Bolt stated that eventually his criminal lawyer, Mr. Southern, arranged for a neurological

examination, which Bolt planned to pay for personally.   Bolt stated that in mid-November, he

was taken out of his cell and was told he was being taken to an appointment with a neurologist;

but, that Nurse Watson canceled the doctor's visit. Bolt was not sure who made the appointment,

but assumed his attorney, Mr. Southern, arranged the appointment with the cooperation of the

deputies.  The Court takes judicial notice that in <u>USA v. Bolt</u>, U.S. District Court, Western

District of Arkansas, Fayetteville Division, Case No. 13-50085, Mr. Southern filed a motion on

Bolt's behalf for the emergency motion for transport to a medical appointment on November 19,

2013.  The motion was filed after Bolt's appointment with a neurological specialist was

canceled.  The Court held a telephone conference call on the motion, which was recorded; and,

then denied the motion on November 20, 2013.  Further, the Court has since reviewed the

recording of the telephone conference call on the motion, and takes judicial notice that it is the

protocol of the United States Marshal's Service that, for federal detainees, any medical

appointments outside the jail must be approved by the Marshal's Service and, for security

reasons, scheduled and arranged by the Marshal's Service. (Doc. 53).   While Bolt argued that

his understanding was that there was an agreement between the Marshal's Service and the BCDC

staff concerning his transport for the neurological appointment and that Nurse Watson then

-16-

canceled it, the Court notes that during the November 2013 hearing, Mr. Southern made no mention of that agreement.

Bolt also stated that Nurse Watson was deliberately indifferent to his medical needs because she testified to the Court untruthfully concerning the tests for Lyme Disease that were ordered for Mr. Bolt. Bolt argued that Nurse Watson's misleading testimony is evidence of her attitude of indifference for his medical care. Mr. Bolt argued that basically Nurse Watson "did nothing" when she should have helped him with his neurological problems; and, that she continued to ignore his requests for help.

Bolt also argued that Nurse Watson failed to properly package his medications for transport when he was transported from the BCDC in Bentonville, Arkansas to the WCDC in Fayetteville, Arkansas. Bolt testified that he asked for nitroglycerin during his approximate 30 minute transport and was told that nitroglycerin was not sent with him. He testified that he was also told that Nurse Watson packaged his medications for transport.

**Medical Records:**

During the summary judgment hearing, it became apparent that it would be helpful to review additional medical records of Bolt, both prior to Bolt's incarceration at the BCDC and after his incarceration at the BCDC. Subpoenas were issued for the receipt of the following medical records:

* to Baptist Medical Center, Oklahoma City, Oklahoma, "all records, whether print or electronic, regarding the care, treatment, and diagnosis of James W. Bolt . . . from January 1994 to January 1995";

* to Federal Medical Center Lexington, "all records, whether print or electronic, regarding the medical care, treatment, and diagnosis of James W. Bolt . . . from January 2014 to present";

-17-

\* to Oklahoma University Medical Center, Edmond, Oklahoma, "all records, whether print or electronic, regarding the medical care, treatment, and diagnosis of James W. Bolt . . . from January 1994, to January 1995";

\* to Oklahoma University Medical Center, Oklahoma City, Oklahoma, "all records, whether print or electronic, regarding the medical care, treatment, and diagnosis of James W. Bolt . . . from January 1994, to January 1995";

\* to Washington County Detention Center, Fayetteville, Arkansas, "all records, whether print or electronic, regarding the medical care, treatment, and diagnosis of James W. Bolt . . . from December 2013 to present".

Both Oklahoma University Medical Center in Edmond, Oklahoma and Oklahoma City, Oklahoma responded to the subpoenas and stated that a search of their records did not result in a patient that matched the request. (Doc. 58, 63, 64). Despite the subpoena and repeated phone calls, Baptist Medical Center in Oklahoma City, Oklahoma did not respond to the Court's request for medical records. Court staff was told that they would not respond to an out-of-state subpoena.

The Court received medical records from the Federal Medical Center Lexington and the Washington County Detention Center, which will be summarized below.

**Washington County Detention Center**

According to the records, Bolt was an inmate at the Washington County Detention Center ("WCDC") from December 23, 2013 until July 10, 2014. The Inmate Medical Form, dated December 26, 2013, notes heart trouble in 1993; a pacemaker in 1994; and, high blood pressure in 1994. The Inmate Medical Form notes the following medications: aspirin, diltiazam, lisinopril, naproxen sodium, mapap, trazadone and nitro. It further states that Bolt "states he has a neruodegenerative (sic) disease, suffers chest pains, sleeping problems, a heart condition, and

-18-

has had a pacemaker implanted in 1994." Bolt also noted a torn rotator cuff, and a walking and gait disorder that had gotten progressively worse since September of 2013.

A United States Marshal's Service Prisoner Medical Request noted that Bolt had seen a doctor, was unsteady on his feet, and that he shuffled his feet when he walked. The doctor ordered a neurology consult. The United States Marshal's Service approved Bolt "for consult only" on February 19, 2014.

A WCDC Medical Transport Sheet, dated December 23, 2013, states a medical complaint/problem, "unresponsive, but he is breathing". Records from Washington Regional Medical Center on December 23, 2013 states following examination in the ER, Doctor notes, "I discussed this patient with his PCP (Dr. Mark Miller) and the neurologist on call (Dr. Horan). This patient's symptoms are not consistent with a CVA pathology. I was finally able to get the patient to tell me he thought it was "lyme disease." Dr. Miller told me that he seems to be preoccupied with lyme disease despite extensive lyme workup that was negative. I do believe that this pt is under a lot of stress due to his current legal situation, which I think precipitated this event today. VSS while in ER, labs wnl [within normal limits], imaging/ekg wnl, PT dc'd back to jail."

Washington Regional Medical Center Discharge Instructions dated December 23, 2013 notes "stress reaction."

Among other things, Bolt was treated for a urinary tract infection and a skin rash while at the WCDC. He was administered the following drugs while at the WCDC: Cephalexin 500 mg; Chlorheniramine 4 mg; Diltiazem HCL; Hydrocortisone Cream; Trazodonr 100 MG;

-19-

Naproxen Sodium 220 MG; Aspirin; Sinus Tabs; Furosemide 20 MG; Lisinopril 10 MG; Spiriva Inhaler; Albuterol Inhaler; and Triple Antibiotic Ointment.

Although Bolt was approved for a neurology consult while at the WCDC, it does not appear the consult was ever scheduled by the Marshal's Service.

### Federal Medical Center Lexington

Bolt arrived at the Federal Medical Center Lexington ("FMC") on July 17, 2014. Soon after his arrival, on or about July 29, 2014, a Holter monitor was placed on Bolt for 48 hour heart monitoring. The results were sent to UK Gill Heart Institute for interpretation. This led to pacemaker adjustment. He was also prescribed warfarin due to a history of atrial flutter, atrial fibrillation, and possible CVA in December of 2013. Bolt began physical therapy for his gait issues following an exam in July of 2014.

Bolt complained of a possible CVA or stroke in December of 2013. This was ruled out by a head CT scan on September 11, 2014. He was placed on buspirone for anxiety on August 1, 2014.

Bolt was seen in the audiology clinic on October 6, 2014 and was found to be a hearing aid candidate. Bolt was arranged to be fitted for a hearing aid in his right ear.

On November 17, 2014, Bolt was seen in a neurology clinic via telemedicine for gait disturbance. Neurology requested a CT scan of C and T spine, requested labs including B12, folate, rpr, copper, and requested that Bolt return to the clinic after the testing was completed for further evaluation.

In January of 2015, Bolt's records note that he was being seen in physical therapy for "deconditioning due to a neurological disorder." He was referred to assess his need for custom

-20-

orthotics and footwear.  It was noted that "[h]e wears a pair of white New Balance sneakers which accommodate . . . custom inserts well."

Following a pacemaker check that showed that Bolt had been in atrial fibrillation since February 2015, cardiology advised scheduling cardioversion.  A cardioversion was performed on Bolt on September 10, 2015; it successfully treated his atrial fibrillation/flutter.

On September 29, 2015, Bolt went offsite for a lumbar puncture procedure.  He refused a CT myelogram of the cervical spine, which was to be done concurrently with the lumbar puncture.  Neurology asked for both tests for further clarification of gait irregularity.  Fluid obtained from the lumbar puncture was sent to the lab for testing.

Following complaints of light flashes and sudden vision loss, Bolt's eyes were examined on November 2, 2015, and was referred to follow-up with ophthalmology on November 6, 2015.

**Summary Judgment Standard**

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." National Bank of Commerce v. Dow Chemical Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  "They must show there is sufficient

-21-

evidence to support a jury verdict in their favor." National Bank, 165 F.3d at 607 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." Id. (citing, Metge v. Bachler, 762 F.2d 621, 625 (8th Cir. 1985)).

**Discussion**

As stated above, Bolt claims that his constitutional rights were violated because Nurse Watson was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment of the United States Constitution.  "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." County of Sacramento v. Lewis, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted).  In Butler v. Fletcher, 465 F.3d 340, 344 (8th Cir. 2006), the Eighth Circuit held that deliberate indifference is the "appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care and reasonable safety."

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle  v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)(quoting  Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997)).

-22-

Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" Jolly, 205 F.3d at 1096 (quoting Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir.1995)).  See also Gregoire v. Class, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"  Hudson v. McMillian, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992).  "A serious medical need is 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" Schaub v. VonWald, 638 F.3d 905, 914 (8th Cir. 2011)(citing Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995)).

It appears that Bolt claims that Nurse Watson was deliberately indifferent to his serious medical needs as related to a delay in care for his cardiac condition; a delay in care for his neurological condition; alleged untruthful testimony to the Court with respect to his care; and, improperly and incompletely packaging his medications for his transport from the BCDC to the WCDC.  Nurse Watson argues that Bolt failed to exhaust his administrative remedies and that she was not deliberately indifferent to his medical needs. Following a discussion on exhaustion, I will address each of the allegations separately.

-23-

## Exhaustion of Administrative Remedies

According to 42 U.S.C. 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  Further, "exhaustion is required where administrative remedies are available even if the available administrative remedies do not provide the precise, or full, relief sought." Walker v. Maschner, 270 F.3d 573, 577 (8th Cir. 2001)(citing Booth v. Churner, 532 U.S. 731, 738-39 (2001)).  Nurse Watson argues, and the Court agrees that Bolt failed to exhaust his administrative remedies with respect to each claim.  Although the record shows written complaints concerning funds that were removed from his account for medicines Bolt received, and written indication that Bolt believed that Nurse Watson had a "conflict of interest" and that he wanted someone else to "handle his care issues," there are no specific complaints concerning Nurse Watson's care of Bolt.[2]  Because Bolt did not exhaust his administrative remedies, his claims against Nurse Watson are subject to dismissal.

## Cardiac Condition

As set forth above, I find that Bolt has failed to exhaust his administrative remedies with respect to his claims concerning his cardiac condition.  However, even absent the failure to exhaust finding, I find his claims concerning his cardiac condition fail to survive summary judgment.

---

[2]Bolt testified that he submitted a written grievance on plain paper concerning a delay in requests for nitroglycerin; but, that he never received a response from the BCDC concerning the grievance.  The record contains no such writing; and, the Affidavit of Sergeant Tiffany DeVore indicates that if an inmate properly submitted a grievance, the grievance would have been answered by the BCDC and contained in the inmate's booking file.  (Doc. 52).  The Court therefore, finds no proof that exhaustion has been accomplished.

AO72A
(Rev. 8/82)

Bolt argues that Nurse Watson generally ignored him and caused a delay in treatment of his cardiac condition.  Bolt testified that he did not receive nitroglycerin approximately six (6) times after having requested it.  Bolt testified that his cardiac condition was not diagnosed due to Nurse Watson's lack of care.

From the records it is clear that Bolt was seen by Nurse Watson and other medical staff on multiple occasions concerning his cardiac condition.  He was treated with nitroglycerin on multiple occasions; and, although Bolt states that Nurse Watson ignored his complaints and did not respond to at least six (6) requests for nitroglycerin, it is not clear that each of Bolt's requests for nitroglycerin were made directly to Nurse Watson or were relayed to Nurse Watson.  Further, Bolt's generalized claims fail to present a claim sufficient to survive summary judgment. Finally, it is Bolt's testimony that he was only recently effectively diagnosed and treated for his heart condition, atrial fibrillation, almost two (2) years after his stay at the BCDC.

### Neurological Condition

Again, as set forth above, I find that Bolt has failed to exhaust his administrative remedies with respect to his claims concerning his neurological condition.  However, even absent the failure to exhaust finding, I find his claims concerning his neurological condition fail to survive summary judgment.

Bolt complains that Nurse Watson ordered a test for Lyme Disease that was not sufficient to diagnose the condition; that she canceled an appointment with a neurologist, delaying diagnosis; and that her ambivalence concerning his medical condition delayed an appropriate diagnosis.  I find that the undisputed material facts fail to support Bolt's claims.  It is clear that which test to order concerning Lyme Disease was within the purview of Dr. Lafferty, rather than

-25-

Nurse Watson.  Further, even over two (2) years after his release from the BCDC, Bolt has yet to be diagnosed with Lyme Disease.  Bolt's medical records reflect that although neurological testing continues at the FMC, a condition has not been identified.  Finally, I have taken judicial notice that it is the protocol of the United States Marshal's Service that, for federal detainees, any medical appointments outside the jail, must be approved by the Marshal's Service and, for security reasons, scheduled and arranged by the Marshal's Service.

Accordingly, I find no support to Bolt's claims that Nurse Watson's actions were deliberately indifferent to Bolt's serious medical needs with respect to his neurological condition.

### Alleged Untruthful Testimony

In addition to the finding that Bolt failed to exhaust his administrative remedies, with respect to Bolt's argument that Nurse Watson was deliberately indifferent to his serious medical needs as a result of untruthful testimony during a hearing before the Court concerning his transport to a medical appointment outside of the jail, I find that Nurse Watson is entitled to absolute immunity.  Briscoe v. LaHue, 460 U.S. 325 (1983).  See also Rehberg v. Paulk, 132 S.Ct. 1497, 1504-1505 (2012).  When a witness is sued under 42 U.S.C. § 1983, the "witness has absolute immunity with respect to *any* claim based on the witness' testimony."  Rehberg v. Paulk, 132 S.Ct. at 1505.

### Packaging of Medication for Transport

Again, I find that Bolt failed to exhaust his administrative remedies with respect to his claim concerning Nurse Watson's alleged deliberate indifference to his medical condition when she failed to package all necessary medication during his transport from the BCDC to the WCDC.  Further, I find that the facts set forth are not sufficient to survive summary judgment.

-26-

During the hearing, Bolt argued that Nurse Watson packaged his medication for transport from the BCDC to the WCDC – an approximate 30 minute drive from Bentonville, Arkansas to Fayetteville, Arkansas; that during the transport he requested nitroglycerin for chest pains; that he was told by the transport officers that no nitroglycerin was packaged for delivery to the WCDC; that he was told that Nurse Watson packed his medication for the transfer; and, that Nurse Watson knew that he suffered from a heart condition; and, that cold weather could aggravate his condition.

The Court finds no proof that Nurse Watson packaged his medication for transfer from the BCDC to the WCDC; and, further finds that the facts do not support that a failure to include nitroglycerin for the 30 minute transport support a deliberate indifference to a serious medical need.  This claim is, therefore, subject to summary judgment.

### Qualified Immunity

Finally, I find that Nurse Watson is clearly entitled to qualified immunity as a matter of law on Bolt's claims against her.  "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  Ashcroft v. al-Kidd, 563 U.S. 731, ____ (2011).  Bolt's allegations fail to set forth a clear constitutional violation as a matter of law.

### Conclusion

For the reasons above, I recommend that Defendant's Motion for Summary Judgment (Doc. 35) be **GRANTED** and this case dismissed with prejudice.

-27-

AO72A
(Rev. 8/82)

The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 1st day of February, 2016.


/s/ Erin L. Setser
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-28-