## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**JAMES W. BOLT**                                                        **PLAINTIFF**

**V.**                         **CASE NO. 5:14-CV-05223**

**NURSE DARLA WATSON**                                             **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

Now before the Court are the Report and Recommendation ("R&R") (Doc. 67)

issued on February 1, 2016, by the Honorable Erin L. Setser, United States Magistrate

Judge for the Western District of Arkansas, and the Objections to the R&R (Doc. 71) filed

by Plaintiff James W. Bolt on March 25, 2016. Objections to the R&R were originally due

on February 19, 2016. Mr. Bolt filed a request for extra time to submit objections, and the

Court granted the request, extending the deadline to March 21, 2016. As of March 23,

2016, no objections had been filed. Consequently, the Court reviewed the R&R and

entered an Order adopting it and granting Defendant's Motion for Summary Judgment

(Doc. 35). Two days later, the Court received Mr. Bolt's Objections. The Certificate of

Service attached to the Objections affirms it was placed in the prison mail system on March

20, 2016.

According to *Houston v. Lack*, 487 U.S. 266 (1988), a *pro se* prisoner's notice of

appeal is deemed filed on the day it is delivered to prison officials for forwarding to the

court. *Id.* at 270. This is known as the "prison-mailbox rule." The Eighth Circuit has not

decided the issue of whether to extend the prison-mailbox rule to filings other than notices

of appeal; however, the Court implied in *Miller v. Benson* that this rule may likely apply to

1

written objections to a magistrate judge's report and recommendation. 51 F.3d 166, 169 (8th Cir. 1995). For this reason, the Court vacated both its Order adopting the R&R (Doc. 69) and its Judgment of Dismissal (Doc. 70), both of which were entered on March 23, 2016. The Court reopened the case and considered Mr. Bolt's Objections to have been timely filed.

Now that the Court has reviewed the entire record *de novo*, pursuant to 28 U.S.C. § 636(b)(1), including the audio recording of the summary judgment hearing conducted by Judge Setser on October 26, 2015, the Court finds that Mr. Bolt's Objections offer neither law nor fact that would justify deviating from the findings and recommendations in the R&R. Accordingly, the R&R will be **APPROVED** and **ADOPTED IN ITS ENTIRETY**, and Mr. Bolt's Objections will be overruled for the reasons explained herein.

## I. BACKGROUND

The R&R contains a thorough recounting of the relevant facts in this case, such that the Court need only summarize the procedural history to give context to Mr. Bolt's Objections. The original Complaint (Doc. 1) was filed on July 14, 2014. In the Complaint, Mr. Bolt asserts that his constitutional rights were violated, pursuant to 42 U.S.C. § 1983, by Defendants Jane Doe 1, Sheriff Kelly Cradduck, Nurse Darla Watson, Special Agent Robert Cassario, and Sheriff Tim Helder. Magistrate Judge Setser performed an initial screen of the Complaint pursuant to 28 U.S.C. § 1915(e)(2) on October 10, 2014, and concluded that the claims made against all Defendants except Nurse Watson should be dismissed. *See* Doc. 8. The Court then adopted Judge Setser's recommendations in an Order (Doc. 12) entered on November 7, 2014. Nurse Watson was served with the

2

Complaint, and the case proceeded to the discovery phase.

According to the Complaint, Mr. Bolt suffers from a number of health problems, including cardiac issues, and had a cardiac pacemaker implanted several years ago. On the day he was arrested on federal charges, August 29, 2013, he was transported to the Benton County, Arkansas, Detention Center ("BCDC"). Within an hour of arriving at the jail, he began experiencing chest pain and was taken to the hospital. (Doc. 1, p. 30). The following day, August 30, 2013, he was released from the hospital and prescribed various heart-related medications. On August 31, 2013, he was transported from the jail back to the hospital for further treatment. *Id.* at p. 32. Thereafter, he experienced "ongoing problems with shortness of breath, poor exercise tolerance, nausea, vomiting and periodic chest pain," all of which "was reported to staff" at the BCDC. *Id.* According to Mr. Bolt, however, his medical problems worsened from mid-September to the end of December of 2013, and he said he began experiencing a panoply of neurological issues, including walking and balance problems, difficulty processing language, cognitive impairments, visual disturbances, dyslexia, olfactory disturbances, and even "mild seizures." *Id.* at p. 33.

In Mr. Bolt's view, Nurse Watson displayed indifference to his medical needs from the first day he arrived at the BCDC. He reported to her and other medical personnel at the jail that he believed some or all of his medical problems might be caused by "recurrent Lyme infection in [his] central nervous system." *Id.* He told Dr. Scott Lafferty, the jail's doctor, that he had contracted Lyme Disease in 1994. Dr. Lafferty then ordered Mr. Bolt to undergo a screening test for Lyme Disease on October 3, 2013, and Mr. Bolt's attorney scheduled him to see a neurologist outside the jail. The blood test for Lyme Disease came

3

back negative on October 9, 2013. Then, in mid-November of 2013, as Mr. Bolt was about to depart the jail for the neurologist's visit, he alleges that Nurse Watson "learned of the appointment and immediately instructed deputies to not take [him] to the exam." *Id.* at p. 34. It appears that after this neurologist's appointment was cancelled, Mr. Bolt's criminal defense attorney filed a motion requesting emergency medical transport to the neurologist's appointment. The Court held a telephonic hearing on the motion on November 20, 2013, and denied it, finding that the appointment had not been scheduled and given advance approval by the United States Marshal's Service ("USMS"), as per their protocol. *See* Doc. 24, Case No. 5:13-CR-50085, *United States v. James Bolt* ("[A]s Defendant is a federal detainee, any medical appointments outside the jail must be approved by the Marshal's Service and, for security reasons, scheduled and arranged by the Marshal's Service.").

On September 11, 2015, Nurse Watson filed a Motion for Summary Judgment (Doc. 35) and Brief in Support (Doc. 36). Judge Setser held an evidentiary hearing regarding the Motion on October 26, 2015, and Mr. Bolt was in attendance and gave sworn testimony. Following the hearing, on November 23, 2015, Mr. Bolt filed a document titled "Plaintiff's Objections Regarding the October 26, 2015 Teleconference/Hearing" (Doc. 61), in which he argued that the Court should not have allowed into evidence Nurse Watson's answers to interrogatories and Deputy United States Marshal Tony Overstreet's "unsworn comments" regarding USMS policy on medical appointment authorizations.[1] Mr. Bolt also

---

[1] Deputy Overstreet's comments were made telephonically during the November 20, 2013 motion hearing in Mr. Bolt's criminal case. In the Order issued following the hearing, Judge Setser took judicial notice of the USMS policy, and Mr. Bolt has not argued in the course of these civil proceedings that Judge Setser incorrectly characterized the policy or Deputy

complained that he had not been permitted "the opportunity to respond in writing to the Motion for Summary Judgment filed by Defendant." *Id.* at p. 1.

In response to Mr. Bolt's post-hearing objections, Judge Setser issued an Order on December 7, 2015 (Doc. 62), in which she explained that she did not previously "disallow" Mr. Bolt the opportunity to file a written response to the Motion for Summary Judgment, but that she would hold in abeyance her R&R on the Motion until December 21, 2015, in order to allow him time to submit that written response.

Mr. Bolt claims in the Objections to the R&R that are now before the Court (Doc. 71) that he never received Judge Setser's Order (Doc. 62) granting him permission to file a written response to the summary judgment Motion. *See id.* at p. 1.   The R&R was eventually filed on February 1, 2016, and it recommended granting the Motion and dismissing the case. Mr. Bolt now informs the Court in his Objections to the R&R, which total 31 pages in length, that they "adequately respond to the motion as well as the R&R." *Id.* Considering this, the Court is well satisfied that both the R&R and the underlying Motion for Summary Judgment have been fully briefed and are ripe for decision.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135

---

Overstreet's representations to the Court.

F.3d 1211, 1212–13 (8th Cir. 1998).

In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In response, "[t]he nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

## III. DISCUSSION

Mr. Bolt explains in paragraph 89 of his Objections to the R&R that summary judgment is inappropriate in this case, despite Judge Setser's recommendation to the contrary, because "fact issues exist in the areas of exhaustion of remedy; quality of care and timeliness of care; and deliberate infliction of injury through denial of access to prescribed medications, all occurring at the hands of Defendant Watson." (Doc. 71, p. 31).

To begin with, the Court will assume for purposes of evaluating the Motion for Summary Judgment that Mr. Bolt adequately exhausted his administrative remedies prior to filing suit. Focusing on Mr. Bolt's substantive objections, the first is his claim that summary judgment is inappropriate because the facts in dispute show that Nurse Watson engaged in a "scheme to deprive [him] of badly needed and Constitutionally guaranteed health care while detained." *Id.* at p. 4. According to Mr. Bolt, he told Nurse Watson while

he was incarcerated at the BCDC that he was experiencing a variety of neurological issues, including unsteady gait, which—in his lay opinion—might have been caused by the recurrence of "Stage 3 Lyme Disease," which was diagnosed in 1994. *See id.* at p. 5. He now suggests that "a competent neurological workup would likely have determined the immediate issue and driven a treatment plan," but instead Dr. Lafferty, who is not a party to this lawsuit, ordered that Mr. Bolt first undergo a test to determine whether Lyme Disease was, in fact, present in Mr. Bolt's body. *Id.* at pp. 5-6. The test indicated that Lyme Disease was "not detected" in Mr. Bolt's blood. *Id.* at p. 6. Although Mr. Bolt argues that a negative result on this sort of blood test does not necessarily exclude the presence of Lyme Disease in trace amounts, and instead "a study of cerebrospinal fluid" would have yielded a more accurate result, *see* Doc. 1, p. 33, the fact remains that a BCDC doctor, and not Nurse Watson, ordered him to undergo the Lyme Disease screening, and that screening came back negative.

Mr. Bolt further contends that Nurse Watson "disobeyed Dr. Lafferty's direct order" to administer a Lyme Disease test using cerebrospinal fluid, rather than blood serum, and in ordering "the wrong test" (apparently because screening blood is not as sensitive or accurate as screening cerebrospinal fluid), she displayed deliberate indifference to his serious medical needs. (Doc. 71, p. 8). He argues that Nurse Watson "had a duty to provide Plaintiff with the minimal standard of care and professionalism"—which, according to Mr. Bolt, could only be achieved by ordering a cerebrospinal fluid screening and not a blood serum screening for Lyme Disease. *Id.*

Upon considering Mr. Bolt's first objection, the Court finds it should be overruled.

7

Even if Dr. Lafferty had ordered a different type of Lyme Disease screening than what was actually administered, and even if Nurse Watson had some hand in scheduling the "wrong" Lyme Disease test, such an error could not create a genuine dispute of material fact as to whether Nurse Watson was deliberately indifferent to Mr. Bolt's serious medical needs, including his neurological concerns. As Judge Setser thoroughly explained in her R&R, a prisoner asserting a claim against a health provider "must show more than negligence, more than even gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000).

Here, the BCDC medical staff received Mr. Bolt's complaints of neurological symptoms. They attempted to locate records to verify his claim that these symptoms might be related to recurrent Lyme Disease, but they were unsuccessful.[2] They then explored Mr. Bolt's hypothesis that his great variety of symptoms might all stem from Lyme Disease, which he suffered 20 years ago, and the attending doctor ordered that he undergo a screening for the disease. It frankly does not matter whether Mr. Bolt should have had a blood serum test, or a cerebrospinal fluid test. The deliberate-indifference inquiry only asks whether Nurse Watson's alleged acts or omissions—here, with respect Mr. Bolt's neurological complaints—were "sufficiently harmful to evidence deliberate indifference to

---

[2] Mr. Bolt admitted in his Objections that Judge Setser also attempted to corroborate his 1994 Lyme Disease diagnosis by issuing various subpoenas for medical records to medical facilities in Oklahoma, where Mr. Bolt claimed the disease was first diagnosed. *See* Doc. 71, p. 14. Judge Setser, like the BCDC, was unsuccessful in finding these records. This does not mean, however, that Mr. Bolt did not actually suffer from Lyme Disease in 1994. He guesses that perhaps "the records were likely to have been destroyed in 2000-2001 in a tornado event." *Id.*

8

[Mr. Bolt's] serious medical needs." *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The BCDC's medical records indicate his written requests for assistance were responded to by Nurse Watson, he was seen multiple times by Dr. Lafferty, he was given medications for his symptoms, and his medical complaints were not ignored, but were being addressed and treated. Mr. Bolt does not argue that, if only Nurse Watson had scheduled him for a different Lyme Disease, and that test had detected the presence of the disease, his medical care and medical condition at BCDC would have changed somehow. Disagreements as to course of treatment do not constitute deliberate indifference. See Ellis v. Butler, 890 F.2d 1001,1003 (8th Cir. 1989). Considering this analysis, summary judgment is appropriate as to this claim.

Next, Mr. Bolt contends that a triable issue of fact exists as to whether Nurse Watson wrongly, intentionally, and/or maliciously cancelled an outside visit to a neurologist with the intent to thwart Mr. Bolt from receiving adequate medical care. This issue is easily dismissed. Mr. Bolt does not dispute that USMS policy requires that outside medical appointments be given advance approval by the USMS, and that the neurologist's appointment at issue was privately scheduled by Mr. Bolt's attorney and had not received the required advance approval. In the face of this evidence, Mr. Bolt is reduced to speculating that perhaps this policy was not uniformly applied, as he believes advance approval was not given before he visited the emergency room on two occasions, took a blood test on one occasion, and underwent an electrocardiogram on one occasion. *See* Doc. 71, p. 10. Such speculation cannot defeat Nurse Watson's proof that her cancellation of the appointment was pursuant to USMS policy. The objection is therefore overruled.

Mr. Bolt's third objection is that Nurse Watson should have initiated a cardiology

9

referral "as part of a patient nursing care plan that a[n] RN would normally establish," (Doc. 71, p. 15), and her failure to make that referral must create a jury question for trial. The R&R recounts the various instances in which BCDC medical personnel treated Mr. Bolt for his heart-related symptoms. Nothing in the record indicates that this treatment was so substandard that it could create a claim for deliberate indifference. If anything, it appears from the BCDC records that Mr. Bolt disagreed with certain treatment decisions made by *Dr. Lafferty* regarding medications. Furthermore, Mr. Bolt admits that Nurse Watson lacked the authority to independently schedule a visit with a cardiologist. *See id.* ("*While she could not order such a consult*, it was her duty at all times to adequately chart and report to her supervising physician, Dr. Lafferty, the condition of any patient in her care." (emphasis added)). This objection is also overruled.

Mr. Bolt's final objection is that a deliberate-indifference claim should remain for trial with respect to Nurse Watson's failure to send a supply of nitroglycerin tablets with Mr. Bolt when he was transported in December of 2014 from the BCDC to the Washington County, Arkansas, Detention Center. He alleges that this failure on her part was intentional, rather than accidental, though he can only speculate that it was her responsibility, and not anyone else's, to package the medication for the approximately 30-minute trip. He also cannot point to any standing order or other medical document that indicates that he was to be supplied with this particular medication for the trip, but instead asserts that Nurse Watson knew about his heart problems, knew they were triggered by stress and exposure to cold air, and knew that "nitroglycerin administered at the time of onset of vasospasm is absolutely essential to mitigation of the event" and that he therefore "should always have had immediate access to the prescribed drug NitroStat 0.4 mg." (Doc. 71, p. 13). Mr. Bolt

10

maintains that he experienced chest pain while in transit to the new jail, and he asked for nitroglycerin tablets at the time. He does not allege that he suffered a serious or lasting cardiac incident during the transport.

In reviewing this objection, the Court finds that even if Mr. Bolt could prove at trial that Nurse Watson, and no one else, was responsible for packaging medicine for his transport to the new jail, and even if Mr. Bolt could also prove that Nurse Watson knew or should have known that such tablets were medically necessary for him to have on the short trip, given his particular cardiac diagnosis, Mr. Bolt has not asserted any facts to show that Nurse Watson's failure to send the tablets for the trip "may so deviate from the applicable standard of care" as to establish deliberate indifference. *See Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001); *Jolly*, 205 F.3d at 1096 (holding that negligence, or even gross negligence, is not enough to establish a constitutional violation). Regardless, the Court concurs with Judge Setser that even if Nurse Watson's failure to pack nitroglycerin tablets for the trip fell below an established or acceptable standard of care, she is entitled to qualified immunity, as this act did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Carroll v. Pfeiffer*, 262 F.3d 847, 849 (8th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

In order to overcome qualified immunity, Mr. Bolt must present sufficient facts to show not only that Nurse Watson's conduct with respect to the nitroglycerin tablets violated a constitutional right, but also that such a right was clearly established at the time of the alleged violation. *Peterson v. Kopp*, 754 F.3d 594, 600 (8th Cir. 2014). Qualified immunity applies if a defendant "did not have 'fair and clear warning' that [her] conduct was

11

unlawful." *Payne v. Britten*, 749 F.3d 697, 708 (8th Cir. 2014) (citing *United States v. Lanier*, 520 U.S. 259, 271 (1997)).  The protection applies unless the unlawful nature of her conduct is "beyond debate." *Id.* (citing *Stanton v. Sims*, 134 S.Ct. 3, 8 (2013)).

Here, it was not clearly established at the time of Mr. Bolt's 30-minute transport from one jail to another that failing to provide him with a supply of nitroglycerin tablets would violate his constitutional right to adequate medical care, and to be free from cruel and unusual punishment.  This claim is properly dismissed, and the objection concerning it is overruled.

## IV. CONCLUSION

For all of these reasons, the Court hereby **ADOPTS AND APPROVES IN ITS ENTIRETY** the R&R (Doc. 67) and **GRANTS** Defendant Nurse Darla Watson's Motion for Summary Judgment (Doc. 35)  Judgment will enter by separate order.

**IT IS SO ORDERED** on this 21st day of September, 2016.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

12